UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT


DONNA L.,

     Plaintiff,

          v.

ANDREW SAUL,
Commissioner of the Social
Security Administration,

     Defendant.

Case No. 2:18-cv-22


## OPINION AND ORDER


Plaintiff Donna L. brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act requesting review of the Commissioner's decision to deny her application for disability insurance benefits. Now before the Court are Plaintiff's motion for judgment reversing the decision of the Commissioner, and the Commissioner's motion for judgment affirming the same. For the reasons set forth below, Plaintiff's motion is **granted**, the Commissioner's motion is **denied**, and the matter is **remanded** for a calculation of benefits.

## BACKGROUND

### I.     PROCEDURAL HISTORY

Plaintiff Donna L. filed an application for Title II disability insurance benefits (DIB) on May 13, 2013, alleging disability as of October 1, 2011. Administrative Record at 589 [hereinafter AR]. The Commissioner denied her application initially and again upon

reconsideration. *Id.* Ms. L. then requested an administrative hearing, which was held before administrative law judge (ALJ) Matthew Levin on March 3, 2015. *Id.* at 662. The ALJ issued an opinion on April 3, 2015, concluding that Ms. L. was not disabled within the meaning of the Social Security Act. *Id.* at 659–74. Following this decision, Ms. L. requested review by the Appeals Council. The Appeals Council denied this request. *Id.* at 1.

Ms. L. then sought judicial review in this Court, claiming that the Appeals Council and the ALJ made several critical errors in their decision to deny her DIB application. *Id.* at 692–93. In an opinion dated October 27, 2016, this Court granted Ms. L.'s motion, reversing and remanding the matter for further proceedings. *Id.* at 709. The Court held that the Appeals Council's failure to consider the June 2015 opinions of treating primary care physician Dr. Michael Johnson and treating psychiatrist Dr. Laura Middleton warranted a remand. *Id.* at 696. The Court also found that substantial evidence did not support the ALJ's decision to give Dr. Johnson's opinions limited weight. Similarly, the Court held that substantial evidence did not support the ALJ's credibility assessment of Ms. L. or his RFC determination regarding her ability to function socially. *Id.* at 709. Following this decision, the ALJ held a new hearing on October 3, 2017 and issued another unfavorable decision on November 16, 2017. *Id.* at 586–606.

II.     PERSONAL AND MEDICAL HISTORY

    A.  <u>Medical History</u>

Ms. L. was born on July 12, 1961. *Id.* at 354. She was 50 years old at the onset of her disabilities and 53 at her date last insured (DLI). *Id.* at 592. Ms. L. has struggled with mental health issues for some time and has seen psychiatrist Dr. Laura Middleton for a panic disorder and agoraphobia since 1997. *Id.* at 304. In addition, Ms. L. has complained of chronic pain to Dr.

Michael Johnson who has acted as her primary care provider since at least 2010. *Id.* at 354. She was found to have Patellofemoral Pain Syndrome in May 2013 and Dr. Johnson diagnosed Ms. L. with fibromyalgia in January 2015. *Id.* at 366.

In October 2011, Ms. L. began working as a cashier for the Richmond Market. *Id.* at 266. She alleges that her disabilities began this same month. *Id.* at 589. Six months later, Ms. L. left this job due to conflicts with coworkers and because she felt it exacerbated her physical ailments. *Id.* at 267. In October 2012, Ms. L. took a position with the Family Dollar but left this job three days later because she could not stand for the nine-hour shifts. *Id.* at 37, 320.

Later that month, Ms. L. met with physician assistant Patrick Kearney for an appointment regarding her joint pain. *Id.* at 345. X-rays from this visit showed that Ms. L. had bilateral facet arthrosis in her L4-5 vertebrae and sacralization of her left L5 transverse process. *Id.* at 346. Kearney authorized x-rays of Ms. L.'s feet, which were taken eight days later, revealing mild degenerative changes in the first metatarsal phalangeal (MTP) joint of the left foot and minimal degenerative changes in the first MTP joint of the right foot. *Id.* at 360. Ms. L. also reported at this appointment that her bilateral knee pain began in October 2012 after standing for nine hours while working at the Family Dollar. *Id.* at 372.

In November 2012, Dr. Johnson referred Ms. L. to Long Trail Physical Therapy to work on her bilateral knee pain. *Id.* During her treatment, Physical Therapist Richard Tremblay diagnosed Ms. L. with osteoarthrosis and made objective findings of "dramatic decreased gastroe[nteritis] flexibility, and associated gait deviations, slight decreased hamstring strength, [and] moderate levels of LCL laxity." *Id.* at 373. Despite her physical therapy, Dr. Johnson noted "severe worsening knee pain" in February 2013.

In May 2013, Dr. Johnson reported that Ms. L.'s anxiety had worsened even with a higher dose of Zoloft. *Id.* at 336. In addition, he stated that Ms. L. had pain in her left gluteal region, left hip, and left foot and believed that the pain was radiating from her back to her foot. *Id.* Dr. Johnson conducted a physical examination that indicated Ms. L.'s spine was straight and non-tender but her paraspinal muscles were tight and tender. *Id.* The examination also demonstrated that Ms. L. had a limited range of motion due to her pain. *Id.* This same month, Dr. Johnson referred Ms. L. to Associates in Orthopedic Surgery to assess her knee pain. *Id.* at 365. Nurse Practitioner Carol Blattspieler examined Ms. L. on May 22, 2013, finding that Ms. L. suffered from Patellofemoral Pain Syndrome. Nurse Blattspieler stated that Ms. L. "should avoid stairs, squatting, [and] kneeling and should make necessary changes while sitting and driving a car if appropriate." *Id.*

In June 2013, an MRI found a tiny central disc protrusion at L4-L5, facet osteoarthropathy in the lower lumbar spine, and probable degenerative change at the level of the left hip. *Id.* at 358. The remainder of the MRI's findings were unremarkable. *Id.* at 357–58. On June 27, 2013, resident Joshua Carter, M.D., saw Ms. L. regarding her left hip in consultation for Dr. Johnson. *Id.* at 432. Dr. Carter observed that Ms. L. "walks with a hunched forward stance." *Id.* at 433. He also found that Ms. L. exhibited "tenderness to palpation around her iliac crest with worsening pain as palpation is performed more posteriorly toward her posterior gluteal musculature and SI [sacroiliac] joint." *Id.* Dr. Carter opined that "[m]uch of her problems appear more muscular tenderness in its origin and . . . may be related to her SI joint or some other etiology." *Id.* at 434. Other results from this exam were normal. *Id.* at 433. Dr. Jennifer Lisle examined Ms. L. with Dr. Carter and agreed with his findings. *Id.* at 434.

In September 2013, Dr. Scott Benjamin examined Ms. L. regarding her chronic pain. *Id.* at 535. He stated that Ms. L. "presents with significant musculoskeletal tightness and inflexibilities, [and] quite a bit of myofascial pain associated with this." *Id.* at 537. He remarked that Ms. L. had "tenderness throughout the trapezius, rhomboids, thoracic and lumbar paraspinals" and that "trigger points [were] all noted." *Id.* He observed significant tightness in Ms. L.'s ankles and significant limitations in her ability to lean and flex her trunk rightward. *Id.* He also noted that Ms. L. "presents with quite a bit of fear about her ongoing pain issues" and that she hoped he would put her on disability that day. *Id.* Dr. Benjamin advised against disability because he believed it would not be beneficial for her physically and recommended gradually progressive aquatic-based physical therapy instead. *Id.*

Ms. L. began aquatic therapy with the RehabGym in October 2013 and continued with treatment until December 2013. *Id.* at 449–67. The record indicates that she was seen by RehabGym around 12 times during this period. *Id.* RehabGym's initial assessment of Ms. L. states that: "P[atien]t presents on this day with decreased lumbar and hip range of motion, decreased core and lower extremity strength, impaired ambulation, generalized tightness, poor posture, and decreased overall endurance." *Id.* at 467. RehabGym's progress notes for Ms. L. indicate that she continued to have joint pain despite physical therapy and reflect her frustration with the lack of progress. *Id.* at 449–67. In November 2013, Dr. Benjamin wrote a letter to Dr. Johnson acknowledging the lack of improvement with Ms. L.'s chronic joint pain. *Id.* at 506. He stated that he encouraged Ms. L. to continue with her physical therapy and noted that "while [he] thinks she has real causes for pain in her body . . . her anxiety about her situation certainly can add to that situation, and she needs to address her pain . . . both from her body and from her mind." *Id.* The following month, Ms. L. met with Dr. Johnson and reported drastically worse

activity levels due to her hip and knee pain. *Id.* at 488. She expressed that she "[did not] know how much was fatigue and how much was pain." *Id.*

In February 2014, during a follow-up appointment with Dr. Lisle, Ms. L. reported that her pain "certainly had not improved." *Id.* at 422. Ms. L. also described "occasional tingling and numbness in her feet." *Id.* Dr. Lisle concluded that Ms. L.'s "symptoms [were] mostly paraspinous and gluteal pain." *Id.* Dr. Lisle's physical examination of Ms. L. produced relatively unremarkable results. *Id.* In this same month, Dr. Lisle referred Ms. L. to Dr. Robert Hemond regarding her back pain. *Id.* at 440. He noted that Ms. L.'s "back pain is constant, vacillating in intensity, [and] exacerbated by standing, sitting, walking and lying down." *Id.* at 441. His review of Ms. L.'s symptoms states that she was positive for back pain and joint swelling and his assessment of Ms. L. reports that she suffers from musculoskeletal low back pain. *Id.* at 441. Dr. Hemond remarked that his physical examination of Ms. L. did not show any "signs of nerve root impingement." *Id.* at 443. He also reviewed the MRI taken in June 2013 and stated that Ms. L. has "mild facet arthropathy in the lumbar spine at 4-5" but opined that the "MRI [was] quite good . . . with minimal degenerative changes." *Id.*

Dr. Johnson continued to see Ms. L. on a regular basis throughout 2014. *Id.* at 471–87. His treatment notes from March 2014 show that he prescribed Ms. L. morphine to combat her ongoing chronic joint pain. *Id.* at 484. The following month, Ms. L. reported severe hip pain even with reduced activity levels, stating that she could only work for 15 minutes before having to stop for 30 minutes. *Id.* Dr. Johnson increased Ms. L.'s Gabapentin prescription in a continued effort to ease her symptoms. *Id.* In May 2014, Ms. L. reported an acute exacerbation of her pain and stated that she increased her intake of Gabapentin and Robaxin in response. *Id.* at 480. At her

next visit in August 2014, Ms. L. reported napping 4 to 5 hours at a time due to her pain. *Id.* at 478.

In September 2014, Dr. Johnson sent Ms. L. to Dr. Thomas Zweber for an EMG and nerve conduction study. *Id.* at 502. Dr. Zweber's studies produced normal results. *Id.* at 503. He found no evidence of a neurotic condition, peripheral neuropathy, lumbar radiculopathy, or tarsal tunnel syndrome. *Id.* However, he did opine that Ms. L. "may have some element of peripheral artery disease affecting her ambulation ability" and stated that "some element of facet syndrome" is likely causing her chronic pain. *Id.*

In October 2014, Ms. L. met with Dr. Jonathan Fenton regarding her history of gluteal pain. *Id.* at 552. Dr. Fenton's physical examination showed that Ms. L. had: reduced lumbar flexion; midline spinal tenderness at L4-5 and L5-S1; para facet tenderness at L3-4, L4-5, L5-S1; para facet tenderness in all sections of her SI joint; gluteal tenderness; hip scour on her left side; anterior hip capsule tenderness; and a positive result during torsional testing of her left side L4-S1 lumbar facets. *Id.* at 554. Dr. Fenton included extreme fatigue in his review of Ms. L.'s symptoms. *Id.* at 553. He diagnosed Ms. L. with lumbosacral pain and myofascial pain. *Id.*

Dr. Johnson then requested that Dr. Carol Talley see Ms. L. to review options for addressing fibromyalgia. *Id.* at 509. At this appointment in December 2014, Ms. L. expressed an increase in shoulder pain and reported needing assistance with washing her hair over the past month. *Id.* Dr. Talley's evaluation of Ms. L.'s right shoulder demonstrated significant active and passive restrictions in her range of motion. *Id.* Additionally, Dr. Talley's physical examination identified general tenderness throughout all muscles in her extremities. *Id.* It also showed that Ms. L. has local areas of "increased tender points in her bilateral upper trapezii, bilateral deltoid

insertion, bilateral lumbar paraspinals, bilateral medial knees and at her lateral elbows." *Id.* at 510. Ms. L. met with Dr. Johnson within weeks of her appointment with Dr. Talley and reported that her pain had worsened to the point of debilitation. *Id.* at 471. She stated that she could no longer do household chores, needed her husband's assistance to get down the stairs, and had trouble getting out of bed at times. *Id.* The following month, Dr. Johnson officially diagnosed Ms. L. with fibromyalgia, noting that she exhibited 18 out of 18 fibromyalgia tender points. *Id.* at 532.

On April 22, 2015, Dr. Narandra Bethina conducted a rheumatological evaluation of Ms. L. at Dr. Johnson's request. *Id.* at 86. Dr. Bethina recorded fibromyalgia, other malaise, fatigue, and sleep disturbance as Ms. L.'s diagnoses. *Id.* at 82. Her physical examinations revealed that Ms. L. had paraspinal tenderness at the cervical and lumbar region and multiple symmetrical tender points. *Id.* at 89. Dr. Bethina concluded that Ms. L.'s "overall symptoms [were] from Fibromyalgia" and suggested that Ms. L. discuss with Dr. Middleton the possibility of adding Amltriptyline or Savella to her medications. *Id.* at 86.

In November 2016, rheumatologist Dr. Chi Chi Lau began treating Ms. L. for her fibromyalgia. Dr. Lau's physical examination found several abnormalities including: decreased cervical spine rotation, lumbar spine flexion to 80 degrees with discomfort, decreased bilateral shoulder rotation to 30 degrees with discomfort, tender lower lumbar and SI area, tender bilateral trochanteric bursae, bilateral mid-feet tenderness, and bilateral metatarsal phalangeal tenderness. *Id.* at 984. Dr. Lau diagnosed Ms. L. with fibromyalgia and osteoarthritis in her lumbar spine's facet joint. *Id.* at 985. He also noted that Ms. L. struggles with generalized anxiety despite her chronic narcotic use. *Id.*

In April 2017, state agency consultant Timothy Cook examined Ms. L. at the Commissioner's request. *Id.* at 985. Dr. Cook's physical examination showed that Ms. L. had a limited range of motion in both of her shoulders and both of her hips. *Id.* at 912. He also elicited trigger point tenderness with palpation of her back. *Id.* Dr. Cook noted that Ms. L. was able to perform the finger-to-nose test but observed that her hand shook during the test. *Id.* at 913. Ultimately, he concluded that the physical exam was "chiefly remarkable for extensive trigger point tenderness, . . . weakness in the upper and lower extremities, some restricted range of motion at the hips bilaterally, . . . unsteadiness with performing the squat maneuver, . . . inability to raise on the toes, and unsteadiness in the gait." *Id.* at 914.

B. <u>Opinion Evidence</u>

Dr. Johnson submitted a Medical Source Statement in February 2015. *Id.* at 555–60. He opined that Ms. L.'s impairments extremely limited her ability to concentrate and would reduce her pace in performing work-related activities more than 20%. *Id.* at 555. He stated that Ms. L. would need more than ordinary breaks during a workday and could not lift or carry more than 10 pounds. *Id.* at 555, 557. He wrote that Ms. L. could only stand or walk for less than 2 hours in an 8-hour workday, could only sit for 15 minutes before having to stand and walk around for 15 minutes, and would have to lie down for 4 hours during the course of the day. *Id.* at 557–58. He noted that both Ms. L.'s upper and lower extremities were extremely limited in their ability to push and pull and that she could only perform manipulative activities[1] for less than 1/3 of the workday. *Id.* at 558. He indicated that Ms. L.'s medications have side effects that adversely affect her ability to perform work-related activities, including sedation and an inability to

---

[1] The Medical Source Statement form defines manipulative activities as reaching, handling, fingering, and feeling. *Id.*

concentrate and think clearly. *Id.* at 559. Dr. Johnson supported his assessments by stating that medical and clinical findings show that Ms. L. suffers from "constant pain, fatigue, [and] anxiety." *Id.* He also noted that Ms. L.'s "symptoms have continually worsened over the last 3 years despite adjusting medical therapies and multiple specialist consultations." *Id.* at 560.

Dr. Middleton completed a mental health Medical Source Statement in February 2015. *Id.* at 580–85. She stated that Ms. L. has a generalized persistent anxiety accompanied by motor tension, autonomic hyperactivity, apprehensive expectation, and vigilance and scanning. *Id.* at 580. She indicated that Ms. L. has "[a] persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation." *Id.* Dr. Middleton emphasized that Ms. L. "has adapted her lifestyle to her agoraphobia and has never since I've known her NOT been severely anxious or agoraphobic." *Id.* at 582 (capitals in original). In addition, she opined that Ms. L. has difficulty completing tasks in a timely fashion and that she has marked limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace. *Id.* at 582. Highlighting Ms. L.'s conflicts with management at the Richmond Market, Dr. Middleton indicated that she would expect Ms. L. to have difficulty responding appropriately to coworkers, supervisors, and changes in a routine work setting. *Id.* at 583. She expressed her belief that Ms. L.'s physical limitations prevent her from working and noted that she "has deteriorated in terms of her physical functioning since 2011." *Id.* at 585.

Dr. Johnson submitted a supplemental Medical Source Statement on June 5, 2015 that reported that Ms. L.'s symptoms had worsened since his first Medical Source Statement. *Id.* at 873. He stated that Ms. L.'s general symptoms had intensified and that she now requires a cane

in the morning because of her elevated morning stiffness and pain. *Id.* He explained that Ms. L. experiences flare-ups of her fibromyalgia symptoms everyday "throughout the day and night" and indicated that some days the flare-ups are continuous. *Id.* at 873. Dr. Johnson opined: "I don't think that [Ms. L.] is currently capable of working. She is disabled even on 'good' days." *Id.* He explained that if Ms. L. tries to lift anything over 5 pounds then her muscles fatigue and hurt. *Id.* at 874. Similarly, if she stands, walks, or sits for more than 15 minutes, then she develops worsening pain in her trigger points and has to rest. *Id.* He remarked that if Ms. L. reaches, handles, fingers, or feels objects repetitively, then she develops fatigue and pain. *Id.* He noted that her medications provide "some limited improvement in her symptoms" but they impair her ability to think clearly and to concentrate. *Id.* at 875. He expressed that he "ha[d] no reason to expect that she could perform even light tasks outside of the home without suffering an exacerbation of her fatigue and pain" when "she can not even compete light tasks in her own home where she can rest as much as needed." *Id.* at 874. Dr. Johnson stated that he based his assessment of Ms. L.'s condition on over 20 office visits and his review of recommendations from multiple specialists, including rheumatologists and psychiatrists. *Id.* at 877.

Dr. Middleton also submitted a supplemental Medical Source Statement in June 2015. *Id.* at 899–902. She agreed with Dr. Johnson, stating that Ms. L.'s conditions had worsened since February 2015. *Id.* Dr. Middleton stated that Ms. L. requires more medication to function and that she is unable to perform routine household tasks at a rate that was previously easy for her. *Id.* at 899–900. She also noted that Ms. L. had "marked agoraphobia" and that she does not leave the house without her husband. *Id.* at 900.

Dr. Cook completed a Medical Source Statement following his examination of Ms. L. in April 2017. *Id.* at 916–21. He remarked that Ms. L. could lift and carry: up to 10 pounds for over two-thirds of the time; 11 to 20 pounds between one-third and two-thirds of the time; and 21 to 50 pounds up to one-third of the time. *Id.* at 916. He opined that Ms. L. could, without interruption, sit for six hours, stand for four hours, and walk for four hours of an eight-hour workday. *Id.* at 917. He also stated that Ms. L. could reach, handle, finger, feel, and push and pull for up to one-third of the workday. *Id.* at 918.

Psychiatrist Dr. Stuart Gitlow testified as a medical expert at the second hearing. *Id.* at 626–42. He acknowledged that Ms. L. has an anxiety disorder but criticized her prescription regimen and suggested that her medications may be the cause of some of her limitations. *Id.* at 627, 632. He felt that Ms. L. had a moderate limitation in her ability to adapt and likely had a moderate limitation in her social functioning. *Id.* at 629. Dr. Gitlow opined that Ms. L. would require limited interactions with the general public and only occasional interaction with coworkers. *Id.* at 630. He indicated that Ms. L. would likely require "an extra few weeks in order to come up to the processing pace and speed that would normally be expected more rapidly." *Id.* He also stated that the longer the commute, the more anxiety Ms. L. would experience and the longer her transition period would take. *Id.* at 631. Ultimately, Dr. Gitlow concluded that Ms. L. "falls into the anxiety paradigm, but does not meet[] B or C criteria." *Id.* at 629.

III.   THE ALJ'S DECISION

A.   Overview of the Five-Step Sequential Evaluation Process

The ALJ applied the five-step sequential process set forth in 20 C.F.R § 404.1520 to evaluate Ms. L.'s disability claim. *See Butts v. Barnhart*, 388 F.3d 377, 380-81 (2d Cir. 2004).

The first step of this process requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b) (2017). If the claimant is not engaging in such activity, then step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. §§ 404.1520(c), 416.920(c). If the ALJ finds that the claimant has a severe impairment, then the third step requires the ALJ to determine whether that impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). §§ 404.1520(d), 416.920(d). The claimant is presumptively disabled if his or her impairment meets or equals a listed impairment. *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ must proceed to the fourth step. The ALJ begins this step by determining the claimant's residual functional capacity (RFC). An individual's RFC equals that person's ability to perform physical and mental work activities on a sustained basis despite limitations from an impairment. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). To make RFC determinations, ALJs must consider all of the claimant's impairments—including those that are not severe—and must base their findings on all the relevant medical and other evidence in the record. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). Then, the fourth step requires ALJs to consider whether the claimant's RFC precludes the performance of his or her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work." 20 C.F.R. §§ 404.1520(g), 416.920(g).

Claimants bear the burden of proving their case at steps one through four. *Butts*, 388 F.3d at 383. At step five there is a "limited burden shift to the Commissioner" to provide evidence demonstrating that other work exists in significant numbers in the national economy that the

claimant can perform. *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

> B.   The ALJ's Analysis of Ms. L.'s Case

In this case, the ALJ found at step one that Ms. L. had worked since the alleged disability onset date of October 1, 2011, but that her work activity did not rise to the level of substantial gainful activity. *Id*. at 592. Then, at step two, the ALJ determined that Ms. L. suffered from "the following severe impairments: an anxiety disorder, fibromyalgia and patellofemoral arthritis." *Id*. Additionally, the ALJ concluded that Ms. L.'s degenerative disc disease did not qualify as severe but stated that he considered the condition when determining Ms. L.'s Residual Functioning Capacity. *Id.*

At step three, the ALJ found that none of Ms. L.'s impairments, alone or in combination, met or medically equaled a listed impairment. *Id.* In making this determination, the ALJ considered whether Ms. L.'s patellofemoral arthritis met or equaled the criteria of listing 1.02 (major dysfunction of a joint due to any cause). *Id.* He found that it did not because the record shows that the claimant is able to ambulate effectively. *Id.* The ALJ also considered Ms. L.'s fibromyalgia in the context of listing 14.06 (undifferentiated and mixed connective tissue disease). *Id.* at 593. He found that her fibromyalgia did not meet or medically equal this listing because Ms. L. "does not have at least two of the constitutional symptoms or signs, defined as severe fatigue, fever, malaise, or involuntary weight loss, nor does she have a marked level of limitation in daily activities, social functioning, or concentration, persistence, and pace." *Id.*

The ALJ also considered "paragraph B" criteria to assess Ms. L.'s anxiety disorder. *Id*. In doing so, the ALJ determined whether Ms. L.'s mental impairments resulted in one extreme or two marked limitations in her ability to: 1) understand, remember, or apply information; 2) interact with others; 3) concentrate, persist, or maintain pace; or 4) adapt and manage herself. *Id*. The ALJ found that Ms. L. had no limitation in her ability to understand, remember, and apply information and in her ability to concentrate, persist, and maintain pace. *Id*. He determined that Ms. L. had a moderate limitation in her ability to interact with others and in her ability to adapt and manage herself. *Id*. at 593–94. The ALJ concluded that "[b]ecause the claimant's mental impairment did not cause at least two 'marked' limitations or one 'extreme' limitation, the 'paragraph B' criteria were not satisfied." *Id*. at 594.

During this assessment, the ALJ noted that Ms. L.'s treating psychiatrist Dr. Middleton opined that Ms. L. had marked limitations in daily activities, maintaining social functioning, and maintaining concentration, persistence, and pace. *Id*. He also acknowledged that Ms. L.'s treating physician Dr. Johnson similarly opined that Ms. L. had extreme limitations in daily activities, maintaining social functioning, and maintaining concentration, persistence, and pace. *Id*. at 594–95. However, the ALJ attributed little weight to these opinions, citing state agency consultant Dr. Gitlow's testimony as support for his conclusions. *Id*. at 595.

The ALJ then determined Mr. L.'s residual functional capacity. In making this determination, the ALJ followed a two-step process to assess Ms. L.'s alleged symptoms. *Id*. First, the ALJ determined whether Ms. L. had an underlying medically determinable impairment[2] that could reasonably be expected to produce her symptoms. *Id*. Second, the ALJ

---

[2] To be medically determinable, an impairment must be able to be shown by medically acceptable clinical or laboratory diagnostic techniques. 20 C.F.R. § 404.1529(b).

"evaluate[d] the intensity, persistence, and limiting effects of [Ms. L.'s] symptoms to determine the extent to which they limit" her ability to perform work-related activities. *Id*. Ms. L. claimed to suffer from numerous symptoms that she linked to both her mental and physical impairments. *Id*. at 596. She testified that, because of these symptoms, "she is unable to manage the demands of work on a regular and full time basis." *Id*. The ALJ concluded that Ms. L. does have "medically determinable impairments [that] could reasonably be expected to produce the above alleged symptoms." *Id*. However, the ALJ found that the objective evidence in the record did not support reducing Ms. L.'s RFC to the extent alleged.

Instead, the ALJ determined that Ms. L.'s RFC allows her to work at medium exertional levels with multiple limitations. *Id*. at 595. First, Ms. L. can "sit for 6 hours, stand for 5 hours, and walk for 5 hours in an 8-hour workday." *Id*. Second, she "can occasionally reach overhead and occasionally push and pull bilaterally." *Id*. Third, Ms. L. "should avoid work requiring ladders, climbing stairs, and unprotected heights, hazards, and balancing." *Id*. Fourth, she "can occasionally stoop, kneel, crouch, and crawl." *Id*. Fifth, Ms. L. "should have only limited social interaction with the general public, meaning that she should avoid crowds." *Id*. Sixth, she "should have occasional interaction with coworkers and supervisors, defined as work requiring no tandem tasks or team work." *Id*. Finally, the ALJ stated that Ms. L. "will require supportive supervision at a new job over the first few weeks, but would be within the acceptable tolerances for new employees." *Id*.

At step four, the ALJ determined that Ms. L.'s RFC prevents her from performing past relevant work. *Id*. at 604. Moving to step five, the ALJ assessed Ms. L.'s age, education, work experience, and residual functional capacity and concluded that there were other jobs that exist in

significant numbers in the national economy that Ms. L. could perform. *Id*. at 605–06. The ALJ

consulted the vocational expert in coming to this conclusion. *Id*. The vocational expert testified

that Ms. L. could perform the requirements of representative occupations such as: dispatcher,

sorter, and checker. *Id.* at 605. These occupations combined present an estimated 63,000 jobs in

the national economy. *Id.*

## STANDARD OF REVIEW

In considering a Commissioner's disability decision, the Court "review[s] the

administrative record *de novo* to determine whether there is substantial evidence supporting

the . . . decision and whether the Commissioner applied the correct legal standard." *Machadio v.*

*Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir.

2000)); *see* 42 U.S.C. § 405(g). Substantial evidence is "more than a mere scintilla. It means

such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305.  In its deliberations,

a court should bear in mind that the Social Security Act is "a remedial statute to be broadly

construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## DISCUSSION

I.   THE ALJ ERRED BY ATTRIBUTING LITTLE WEIGHT TO DR. JOHNSON'S
     OPINIONS

Ms. L. claims that the ALJ erred by affording her treating physician Dr. Johnson's

opinion little weight. Under the SSA's treating physician rule, "a treating source's opinion on the

nature and severity of a claimant's condition is entitled to 'controlling weight' if it is: [1] 'well-

supported by medically acceptable clinical and laboratory diagnostic techniques and [2] not

inconsistent with the other substantial evidence in [the] record.'" *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003); 20 C.F.R. § 404.1527(d)(2).

If a treating source's opinion does not receive controlling weight, then the ALJ should consider the following factors to determine what weight to give the opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) whether the opinions are supported by relevant medical evidence or explanation; (4) whether the opinions are consistent with the record as a whole; (5) the specialization of the treating source with respect to the condition being treated; and (6) any other factors that may be significant. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). ALJs do not have to recite each factor in their decisions, but they must "always give good reasons" for the weight they assign to a treating source's opinion. *See Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir.1998); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Failure to do so is grounds for remand. *Halloran*, 362 F.3d at 33.

In this case, the ALJ attributed "little weight" to the opinions of Ms. L.'s treating primary care physician Dr. Johnson. AR at 601. Highlighting the dearth of "clinical examinations documenting deficits consistent with the limitations [Dr. Johnson] identified," the ALJ found that Dr. Johnson lacked objective evidence supporting his opinion. *Id.* He asserted that Dr. Johnson's treatment notes "fail to document . . . anatomical and physiological abnormalities on clinical examination" and criticized his reliance "upon [Ms. L.'s] own description of symptoms and the impact they have upon her functioning."[3] *Id.* In addition, the ALJ claimed that Dr. Johnson's

---

[3] The ALJ claimed that Dr. Johnson's reliance on Ms. L.'s reports to form his opinion contravened 20 C.F.R. § 404.1513 and POMS DI 24501.020. These rules and regulations require that abnormalities be identified by medically acceptable clinical and laboratory diagnostic techniques. Quite tellingly, he neglected to include SSR 12-2p—the Social Security rule that specifically guides how ALJ's should evaluate fibromyalgia claims.

opinion "is not well supported by or consistent with his own treatment notes or the medical evidence of record." *Id.* Not only are these findings unsupported by substantial evidence, they largely conflict with this Court's previous holding. Thus, the ALJ erred in affording Dr. Johnson's opinion little weight.

As this Court previously explained, the ALJ's insistence that Dr. Johnson provide objective evidence regarding Ms. L.'s fibromyalgia suggests that he misunderstood the nature of the disease. *Id.* at 698. He "effectively required 'objective' evidence for a disease that eludes such measurement." *Green-Younger*, 335 F.3d at 108. Evaluating whether a patient exhibits trigger point tenderness is "the primary diagnostic technique for fibromyalgia" and provides the *only* objective signs of the disease. *Id.* at 108 n. 4; *Johnson v. Astrue,* 597 F.3d 409, 412 (1st Cir. 2009). Because "[t]here is no objective tests which can conclusively confirm [fibromyalgia]," it must be diagnosed based largely on a claimant's subjective complaints. *Preston v. Sec. of Health and Human Servs.*, 854 F.2d 815, 818 (6th Cir. 1988); s*ee also Green-Younger*, 335 F.3d at 107 ("[A] patient's report of complaints, or history, is an essential diagnostic tool" for fibromyalgia claims); *see also* SSR 12-2p, No. SSA-2011-0021, 2012 WL 3104869, at *3 (July 25, 2012) (stating that "[a] history of widespread pain" and "[a]t least 11 tender points on physical examination" are the two criteria used to evaluate fibromyalgia claims). Thus, "a treating physician's reliance on such complaints 'hardly undermines his opinion as to [the patient's] functional limitations.'" *Johnson,* 597 F.3d at 412 (quoting *Green-Younger*, 335 F.3d at 107).

Concerning Ms. L.'s physical limitations, Dr. Johnson opined that she could stand or walk for less than 2 hours in an 8-hour workday, could sit for 15 minutes before having to stand and walk around for 15 minutes, and would have to lie down for 4 hours during the course of the

day. *Id.* at 557–58. He noted that both Ms. L.'s upper and lower extremities were extremely limited in their ability to push and pull and that she could only perform manipulative activities for less than 1/3 of the workday. *Id.* at 558. He also remarked that Ms. L. suffers from constant pain and fatigue. *Id.* at 559.

Contrary to the ALJ's claims, Dr. Johnson supported this assessment with medically acceptable clinical techniques, marshalling the only objective evidence available to assess a patient's claims of fibromyalgia. He performed a physical examination of Ms. L. that revealed tenderness in 18 out of 18 trigger points. *Id.* at 532. Based on this evaluation, Dr. Johnson diagnosed Ms. L. with fibromyalgia, stating that she "clearly fit this diagnosis and is clearly debilitated." *Id.* Moreover, Dr. Johnson referred Ms. L. to two rheumatologists, both of whom confirmed Dr. Johnson's findings after conducting their own physical examinations. *Id.* at 86, 985.

Not only did Dr. Johnson ground his opinion on the only objective signs of fibromyalgia, he based it on observations made during his years-long treatment relationship with Ms. L. Dr. Johnson had over 20 office visits with Ms. L. and his treatment notes extensively document her long history of widespread chronic pain. *See id.* at 333, 336, 340, 342, 471, 473, 475, 478, 480, 482, 484, 486, 488, 491. In addition, Dr. Johnson consulted and reviewed the recommendations of multiple physical therapy facilities, numerous specialists, and Ms. L.'s treating psychiatrist Dr. Middleton. *Id.* at 877. His treatment notes illustrate that despite meeting with specialists and participating in these physical therapy programs, Ms. L. continued to suffer from chronic pain and that her symptoms worsened within the relevant time period. *See id.* at 700 ("The record indicates that [Ms. L.'s] symptoms worsened during the relevant period, despite . . . her

attendance at physical therapy sessions, chiropractic and acupuncture treatments, aqua therapy sessions, and appointments with specialists."). Most importantly, Dr. Johnson's notes demonstrate the limiting effects Ms. L.'s pain has had on her ability to function. *Id.* at 342 (explaining that a 9-hour work shift caused so much pain she could not stand for a week); *id.* at 471 (describing her pain as debilitating, stating that it precludes her from doing household chores, that her husband needs to help her down the stairs, and that it makes it difficult for her to get out of bed); *id.* at 478 (stating that her pain forced her to nap 4-5 hours a day); *id.* at 482 (reporting that she can only work for 15 minutes before having to stop for 30 minutes); *id.* at 486 (finding that Ms. L.'s "hip pain [is] still severe" and that she "can't stand for any considerable length of time" or "sit for any length of time without moving.").

These findings show that Dr. Johnson appropriately evaluated Ms. L.'s fibromyalgia and that his assessment is supported by and consistent with his treatment notes. He obtained the only objective evidence of Ms. L.'s symptoms available and had his findings corroborated by two rheumatologists. He also based his opinions on Ms. L.'s reports about the limiting effects of her symptoms. Despite the ALJ's criticism, considering a patient's reports of symptoms and their limiting effects are not only acceptable, but essential in fibromyalgia claims. Thus, the ALJ's arguments do not constitute good reasons to discount the weight given to Dr. Johnson's opinions because he demanded objective evidence that exceeds current medical capabilities.

The ALJ's claim that Dr. Johnson's opinion is not supported by the medical evidence of record flounders for similar reasons. In his review of the record, the ALJ largely cites the discrepancy between Ms. L.'s complaints of pain and the relatively normal results of her physical examinations. *Id.* at 597–99. However, as the Second Circuit has recognized, "[i]n stark contrast

to the unremitting pain of which fibro[myalgia] patients complain, physical examinations will usually yield normal results—a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions." *Green-Younger*, 335 F.3d at 108 (quoting *Lisa v. Sec. of the Dep't of Health and Human Servs.*, 940 F.2d 40, 45 (2d Cir. 1991)). Thus, the relatively unremarkable results of other physicians' examinations do not contradict Dr. Johnson's opinion. Rather, they are expected for patients with fibromyalgia. Thus, these results do not warrant reducing the weight given to Dr. Johnson's opinions.

Viewed properly, the medical evidence of record supports Dr. Johnson's opinions regarding the nature and severity of Ms. L.'s fibromyalgia. As this Court found in its previous opinion, "the vast majority of Ms. L.'s medical providers do not appear to doubt that she experiences pain." AR at 703. For example, as noted above, two rheumatologists confirmed Dr. Johnson's fibromyalgia diagnosis and the record is replete with Ms. L.'s complaints of chronic pain. *Id.* at 86, 985. Moreover, Dr. Benjamin elicited trigger point tenderness during examination and stated in his letter to Dr. Johnson, "I think she has real causes for pain in her body." *Id.* at 550. Dr. Talley noted "general tenderness to pressure through all muscles in [Ms. L.'s] extremities" and "local area[s] of increased tender points in her bilateral upper trapezii, bilateral deltoid insertion, bilateral lumbar paraspinals, bilateral medial knees and at her lateral elbows." *Id.* at 510. RehabGym found that Ms. L. continued to have joint pain despite physical therapy. *Id.* at 449–67.

Most importantly, the opinions of Ms. L.'s treating psychiatrist Dr. Middleton support Dr. Johnson's assessments. *See id.* at 304, 567, 580–85. Like Dr. Johnson, Dr. Middleton extensively documented the effects fibromyalgia has had on Ms. L.'s ability to function in her

treatment notes. *See id.* at 72–73 (stating that Ms. L. is limited by pain and that she cannot perform household chores); *id.* at 570 ("[Ms. L.] continues to deal with her multiple pains."); *id.* at 574 ("she continues to have a lot of problems with pain in her shoulder, back, hips, knees, and feet."); *id.* at 576 ("[Ms. L.] is clearly in more pain today. She is squirming in her seat. She states that pain limits her life."); *id.* at 579 ("[Ms. L.] woke up crying from pain"); *id.* at 585 (opining that Ms. L.'s physical limitations prevent her from working and noting that her physical functioning has deteriorated since 2011); *id.* at 909 (stating that Ms. L.'s "physical deterioration over the past few years has been quite marked" and that she is "NOT the malingering type.") (capitals in original). Viewing the record in its entirety shows that the substantial evidence does not support the ALJ's finding that Dr. Johnson's opinion was inconsistent with the medical evidence of record. Thus, the ALJ erred in reducing the weight given to Dr. Johnson's opinions based on this reasoning.

The only evidence that directly contradicts some of Dr. Johnson's opinions of Ms. L.'s physical limitations comes from the Commissioner's consultant examiner Dr. Cook. Dr. Cook reached different conclusions than Dr. Johnson over Ms. L.'s ability to sit, stand, walk, and lift and carry items. *Id.* at 916–17. He found that Ms. L's conditions created less limitations for her in these categories than Dr. Johnson. *Id.* That said, his opinion does support Dr. Johnson in some respects. For example, Dr. Cook stated that the "[p]hysical exam [wa]s chiefly remarkable for extensive trigger point tenderness and weakness in the upper and lower extremities." *Id.* at 914. In addition, Dr. Cook agreed with Dr. Johnson regarding Ms. L.'s ability to perform manipulative activities, finding that she could only reach, handle, finger, and feel for up to 1/3 of the workday. *Id.* at 918. The Court notes, as in did in the previous opinion, that generally "where there are conflicting opinions between treating and consulting sources, the 'consulting

physician's opinions or report should be given limited weight.'" *Id.* at 704 (quoting *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990)); *see also* 20 C.F.R. § 404.1527(c)(1). However, the Court does not need to reach a conclusion as to whether a single consultant examiner's opinion presents sufficient evidence to obviate controlling weight to Dr. Johnson's opinions. As explained more fully below, the limitations that Dr. Cook and Dr. Johnson agreed on show that Ms. L. is disabled within the meaning of the Social Security Act.

## II.  MS. L.'S ABILITY TO PERFORM MANIPULATIVE ACTIVITIES

The record demonstrates that Ms. L. is disabled due to her limited ability to perform manipulative activities. Manipulative activities include reaching, handling, fingering, and feeling. At the second hearing, the vocational expert testified that if Ms. L. could only occasionally reach, handle, finger, or feel, then she would not be able to perform any of the representative occupations. AR 652, 655. Here, a limitation that allows for "occasional" activity means that the claimant can perform that activity for 1/3rd of the workday or less. The record shows that Ms. L.'s limitations allow her to only occasionally perform manipulative activities.

In his February 2015 opinion, Dr. Johnson stated that Ms. L.'s physical conditions limited her to performing manipulative activities for less than 1/3rd of the workday. *Id.* at 558. Dr. Johnson elaborated on this finding in his June 2015 opinion, stating that "if [Ms. L.] reaches, handles, fingers, or feels objects she is working with on a repetitive basis, then she develops fatigue and pain." *Id.* at 874. As shown above, the ALJ erred in affording Dr. Johnson's opinion little weight. If the ALJ attributed the proper weight to Dr. Johnson, then his opinions—viewed together with the vocational expert's testimony—would provide strong evidence that Ms. L. is disabled because of her limited ability to perform manipulative activities.

In addition, the opinion of the Commissioner's consultative examiner Dr. Cook confirms this conclusion. Following a physical examination of Ms. L., Dr. Cook found that both of her shoulders had a reduced range of motion. *Id.* at 912. The normal range of motion for shoulder flexion and abduction is 150 degrees. *Id.* Dr. Cook found that the range of motion for Ms. L.'s shoulders was restricted to 40 degrees. *Id.* He also found that Ms. L. had reduced motor strength in all major muscle groups in her upper extremities, marking her deltoid, biceps, and triceps strength a 3 on a scale to 5. *Id.* at 913. Following this physical examination, Dr. Cook determined that Ms. L. could only reach, handle, finger, and feel for up to 1/3rd of the workday. *Id.* at 918. Dr. Cook listed "trigger point tenderness and weakness in the upper and lower extremities" as support for this assessment. *Id.*

The ALJ afforded this section of Dr. Cook's opinion little weight and gave the remainder of his opinion great weight. *Id.* at 603.The ALJ stated that "Dr. Cook's assessment of the claimant's ability to engage in manipulative activities is not consistent with either his own evaluation or the remainder of the treatment notes." *Id.* He asserted that Dr. Cook "did not identify any abnormalities or deficits of the hands or fingers" and claimed that "[t]here is no other objective examination in the record documenting any abnormalities or deficits of the hands and fingers." *Id.*

The ALJ erred in his decision to attribute Dr. Cook's opinion little weight. *Id.* To start, the ALJ failed to provide any medical opinion supporting his claim that Dr. Cook's opinion was not consistent with his evaluation. In fact, the record contains no medical opinion showing that Dr. Cook's evaluation should have produced different results if Ms. L. was limited to only occasionally performing manipulative activities. Thus, the ALJ impermissibly substituted his

own analysis of raw medical data for that of a trained physician. *See Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) (quoting *McBrayer v. Sec. of Health and Human Servs.*, 712 F.2d 795, 799 (2d Cir. 1983)) ([I]t is well-settled that the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion. . . . [W]hile an [ALJ] is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician.").

In addition, the ALJ stated that "Dr. Cook did not identify any abnormalities of the hands; he only documented the claimant's subjective complaints." *Id.* at 603. He continued: "There is no other objective examination in the record documenting any abnormalities or deficits of the hands and fingers." *Id.* These findings do not support reducing the weight given to Dr. Cook's opinion for two reasons. First, the ability to perform manipulative activities, particularly reaching and handling, can be limited by more than abnormalities in the hands or fingers. Namely, disabilities in a person's shoulders and arms can prevent them from performing manipulative activities. Dr. Cook's physical examination produced evidence of a restricted range of motion in both Ms. L.'s shoulders and weakness in the major muscle groups of both of her arms. Moreover, Dr. Talley's assessment of Ms. L. lends additional support to Dr. Cook's findings regarding Ms. L.'s shoulders. *Id.* at 510 ("Right shoulder evaluation with significant active and passive range of motion restrictions: abduction 60, external rotation 45, internal rotation zero.").

Second, the ALJ again called for objective evidence of a disease that eludes such measurements and criticized the consideration of Ms. L.'s complaints. As illustrated above, the only objective signs of fibromyalgia are trigger point tenderness, and a claimant's reports of

symptoms is an essential tool for evaluating this disease. Dr. Cook specifically stated that he based his opinion regarding Ms. L.'s ability to perform manipulative activities on "trigger point tenderness." *Id.* at 918. He further supported his statement by citing his findings of "weakness in the upper and lower extremities." *Id.* Thus, the ALJ erred in attributing little weight to this section of Dr. Cook's opinion because the ALJ impermissibly substituted his medical judgement for that of a physician's and called for objective evidence that is impossible to obtain.

The fact that Ms. L.'s long-time treating physician and the Commissioner's own consultant examiner reached the same conclusion concerning her ability to perform manipulative activities presents cogent evidence of her condition. Moreover, the record contains no other medical provider's opinion that refutes Dr. Johnson's and Dr. Cook's opinions. Rather, it contains ample findings that support their assessments. In addition, the vocational expert specifically testified that Ms. L. would not be able to perform any of the representative occupations if she was limited to occasionally performing manipulative activities. Thus, the record leads to only one conclusion—Ms. L. is disabled within the meaning of the Social Security Act and entitled to the benefits thereof. *Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998) ("Where application of the correct legal standard could lead to only one conclusion, [the Court] need not remand."); *see also Butts v. Barnhart*, 388 F.3d 377, 385 (2d Cir. 2004) ("[W]here this Court has had no apparent basis to conclude that a more complete record might support the Commissioner's decision, we have opted simply to remand for a calculation of benefits.").

To be clear, the record contains evidence of a variety of impairments effecting more than just Ms. L.'s ability to perform manipulative activities that could lead the Court to this same

conclusion. Ms. L.'s widespread crippling pain precludes her from accomplishing basic life tasks, much less working full time. Ms. L.'s anxiety and agoraphobia drastically limit her ability to function normally, illustrated by the fact that she rarely leaves the house without her husband there as support. In addition, Ms. L. requires a significant amount of medication to address her symptoms which causes side effects that limit her ability to work on a full-time basis. However, the Court declines to decide on these issues because the medical and opinion evidence regarding Ms. L.'s limited ability to perform manipulative activities dissipates all doubt that Ms. L. is disabled. The record is sufficiently clear on this point alone to render remanding for further proceedings unnecessary.

## **CONCLUSION**

For the foregoing reasons, Plaintiff's motion to reverse is **granted**, the Commissioner's motion to affirm is **denied**, and the case is **remanded** for a calculation of benefits.

DATED at Burlington, in the District of Vermont, this 29th day of October, 2019.

/s/ William K. Sessions III
William K. Sessions III
District Court Judge